LUTHER J. IRELAND et al. *vs.* EDWARD L. CLARK and SCOTT REED.

Aroostook. Opinion June 19, 1912.

*Animals. Teaming Contracts. Duty to Contractors. Master and Servant. Nature of Relation. Customs and Usages. Contributory Negligence.*

1. Defendants, who employed plaintiff's team, sleds, and a driver to haul logs, were not bound to furnish them a safe road to team upon where the road was a public highway across a lake.

2. Plaintiffs, whose team, sleds, and a driver, who might be either one of plaintiffs or some one engaged by them, were employed by defendants to haul logs, bore the relation of contractors and not of employes to defendants, as affecting defendants' duty to provide a safe road to travel.

3. It was actionable negligence for defendants to leave unguarded a hole cut by them in the ice on a lake across which plaintiffs' team was driven in hauling logs for defendants.

4. Evidence of a custom is inadmissible, in the absence of proof of its common prevalence in the community and of the adverse party's knowledge thereof.

5. In an action for death of a horse hired by defendants from plaintiffs, and drowned in a hole cut in ice on a lake used as a public highway, whether plaintiffs were guilty of contributory negligence *Held,* under the evidence, a jury question.

On exceptions by plaintiff. Sustained.

Action on the case to recover damages for the alleged negligence of the defendants in leaving unguarded a hole cut in the ice on Saint

Croix Lake, Aroostook County, during a part of the logging season of 1909 whereby the plaintiff lost a horse by drowning. Plea, the general issue. At the conclusion of the plaintiffs' evidence a nonsuit was ordered and the plaintiffs excepted.

The case is stated in the opinion.

*Powers & Archibald,* for plaintiffs.

*Harry M. Briggs, Amaziah G. Fenalson, Ira G. Hersey and Charles P. Barnes,* for defendants.

SITTING: WHITEHOUSE, C. J., SPEAR, CORNISH, KING, BIRD, HALEY, JJ.

HALEY, J. This is an action on the case, alleging negligence of the defendants in leaving unguarded a hole cut in the ice on St. Croix Lake, in Aroostook County, during a portion of the logging season of 1909, whereby the plaintiffs lost a horse by drowning.

During the trial the plaintiffs' counsel asked the witness Sinclair: "Now I will ask you what the custom among men in the woods who are hauling, in regard to cutting holes in the ice, was?"

The question was excluded, subject to exception.

At the close of the plaintiffs' testimony the presiding Justice ordered a nonsuit, to which the plaintiffs excepted, and bring the case before this court on said exceptions.

The undisputed facts are that on the 23d day of December, 1909, the defendants entered into a contract with the plaintiffs, whereby the plaintiffs were engaged with their team to haul pulp wood for the defendants.

The wood was on the side of St. Croix Lake furthest from the railroad wharf, and the plaintiff Luther, with the team owned by himself and the other plaintiff, hauled the pulp wood (under the contract with the defendants) from the woods through a section called the burnt district and across the St. Croix Lake to the railroad wharf: On the 19th day of January, 1911, the plaintiff Luther J. Ireland saw Mr. Sinclair, who was in the employment of the defendants, cutting a hole in the ice about twenty rods out from the railroad wharf, and about two rods from the road across the lake, that was being used by the plaintiffs and others to haul the pulp wood across the lake.

The plaintiff Luther knew that the hole was being cut to obtain water to put upon the road across the lake that was being used by the teams, that it might freeze and make the hauling easier. The next morning, at about a quarter before six o'clock, the plaintiff Luther, with plaintiffs' team, and other men with their teams, left their camp to go to work. With the teams they traveled upon the lake about a quarter of a mile toward the railroad wharf, then turned to the right, and started across the lake to strike the road that they had been using for teaming across the lake. It was dark, they had no lantern, and during the night there had been a snow fall of about two inches. They missed the road, and the plaintiff Luther got off the sleds and walked ahead looking for the road. He left a man on the sled to drive the horses, who kept them close to plaintiff Luther's right arm. The horses stepped into the hole cut by Sinclair on the previous day. When they went into the water they struck the plaintiff Luther, and he "grabbed them and called for a chain." One of the horses was saved, the other slipped from his harness and was drowned.

The plaintiff Luther testified that he was not looking for the hole that he saw Mr. Sinclair cutting the day before, that he did not think of the hole that morning. The evidence shows that one of the defendants was told when the hole was cut that it ought to be bushed, and that he told the man to go across the lake and make a lunch hole for the teams, and to bush it the next morning.

The plaintiffs claim to recover upon two grounds:

1st. Because the relation of master and servant existed between the plaintiffs and the defendants, and that the master (the defendants) was bound by law to furnish the servants (the plaintiffs) a safe place in which to perform their work, and that the road across the lake was furnished by defendants for the plaintiffs to drive upon, and that the master (defendants) was negligent in causing the hole to be cut so near the road used by the servants (plaintiffs) team furnished by the plaintiffs, without bushing it, or in some other way protecting it, and that the servant (plaintiffs) did not assume the risk, even if one of them did the day before the accident see the hole being cut through the ice; that they had a right to assume that the defendants had performed their duty and protected

the hole, and that, if the hole had been properly protected, the accident would not have happened.

2d. That the lake being a public highway, the plaintiff Luther was lawfully traveling thereon; that the defendants, by cutting the hole in the ice and not bushing it, or protecting it in such a way as to warn travelers, created a nuisance upon the public highway, by reason of which the plaintiffs, without fault on their part, sustained the injury complained of.

1st. We do not think the rules of law governing master and servant are applicable to this case. The plaintiffs' team was employed with a driver, either one of the plaintiffs or some one they might employ, to haul logs. The plaintiffs furnished the driver, horses, harnesses, and sleds. The defendants were under no obligation to furnish them a safe road to team upon. The St. Croix Lake is a great pond, and a public highway that any one may use to cross in boats, or to travel upon when frozen.

"The authorities, ancient and modern, are all consistent, and point in one direction. Highways, whether on land or water, are designed for the accommodation of the public, for travel or transportation, and any unauthorized or unreasonable obstruction thereof is a public nuisance in judgment of law."

*Veazie* v. *Dwinel,* 50 Maine, 479.

"All streams in the State of sufficient capacity in their natural condition to float boats, rafts, or logs, are deemed public highways, and as such are subject to the use of the public."

*Veazie* v. *Dwinel,* 50 Maine, 484.

Cited with approval in *Smart* v. *Lumber Co.,* 103 Maine, 37.

"The true test, therefore, to be applied in such cases, is, whether a stream is inherently and in its nature, capable of being used for the purpose of commerce, for the floating of vessels, boats, rafts, or logs."

*Brown* v. *Chadbourne,* 31 Maine, 9.

Approved in *Treat* v. *Lord,* 42 Maine, 552.

"The right in common to all the citizens to the use of its navigable waters has been established by judicial decisions; and that right is not limited in this State to waters, in which the tide ebbs and flows, but is admitted in lakes and fresh water rivers which are navigable."

*Moor* v. *Veazie,* 32 Maine, 343.

"By the principles of that ordinance 1641-7, which have been too many times recognized, sanctioned, and declared to be a part of the common law of the State, to be now disregarded, it is a public pond, and the use is free to all, who can reach it without trespassing upon the land of others."

*Brastow* v. *Rockport Ice Co.,* 77 Maine, 100.

In *Conant* v. *Jordan,* 107 Maine, 227, this court again declared that all great ponds in this State, without exception, belong to the public. St. Croix Lake being a public highway, the defendants were not bound, by reason of their contract, to keep the lake, or any part of it, safe, as the master is bound to furnish his servant a safe place to work in. They were under no more obligation, by reason of their employment, to furnish a safe highway than is the merchant who employs a teamster to haul his goods from the depot to his store. The owner or driver of a team has the right to use the highways for the purpose of passage; in winter, this includes the right to travel upon the ice, upon the public highway furnished by nature, viz., those rivers and great ponds that are made by our laws public highways, and if any person creates a nuisance upon the highway on the land, or nature's highways, viz., navigable rivers or great ponds, they are liable to the person who sustains an injury thereby, if in the exercise of due care; but their rights are not regulated by the law of master and servant.

Further, the evidence shows that the defendants hired the team of the plaintiffs, either to be paid for by the day, by the load or by the number of feet of lumber hauled, and the plaintiffs furnished the driver, either one of the plaintiffs or some one they might select. The plaintiffs furnished all the appliances used, horses, sleds, harnesses, and driver, and the law is well settled that, under such circumstances, the relation of master and servant did not exist between the plaintiffs and defendants; that the plaintiffs were contractors, not servants.

In the case of *Quarman* v. *Burnett,* 6 M. & W., 499, decided in 1846, and which has been followed by the English courts and most of the courts in this country where the question has arisen, the rule was established that, "where one hires a team or horses of another together with a driver to do a particular job or kind of work, the

driver is not the servant of the hirer. In that case it appears that the owners of a carriage were in the habit of hiring horses from the same person to draw it for a day or a drive, the owner of the horses providing a driver. The driver on one occasion causing injury by his negligence, the owners of the carriage were held not responsible for this injury. And it was further held to make no difference that the owner of the carriage had always been driven by the same driver, he being the only regular coachman in the employ of the owner of the horses; or that they had always paid him a fixed sum for such drives, or that they had provided him with a livery which he left at their house at the end of each drive, and that the injury in question was occasioned by his leaving the horses while so depositing the livery where he was accustomed to leave it. Baron Park in that case says, 'Upon the principle facet per alium, facet per se, the master is responsible for the acts of his servant, and that person is undoubtedly liable who stood in the relation of master to the wrong-doer—he who had selected him as his servant from the knowledge of or belief in his skill and care, and who could remove him for his misconduct and whose orders he was bound to receive and obey.' That person was the owner of the horses, and not any one at whose service the horses and the driver were temporarily placed."

In *Joslin* v. *Grand Rapid Ice Co.,* 50 Mich., 516, Cooley, J., in the opinion states that the doctrine of *Quarman* v. *Burnett* has been too often and too generally recognized and followed to be questioned now, and that case held, that a driver of a team is the servant of the person who is his regular employer and who has the power to direct where and for whom his services shall be given, and to discharge him for misconduct or incompetency, and not of the person who hires the team for a day, although the latter has the right to direct his actions to the extent of indicating where the work was to be done, and may have actually asked for the services of that particular driver.

In *Quinn* v. *Electric Construction Co.,* 46 Fed. Rep., 506, the court recognized the rule as laid down in *Quarman* v. *Burnett,* and held that the driver of a horse and truck who, with them, was selected to perform services for a third party under a contract by his employer to furnish horse, truck and driver daily for a specified

price, was the servant of his regular employer while engaged in such service, and not the servant of the third party.

In *Jones* v. *Corporation of Liverpool*, L. R., 14, 2 B. D., 895, the corporation owned a water cart, and contracted with Mrs. Dean for a horse and driver, that it might be used in watering the street. The horse belonged to her, and the driver she employed was not under the control of the corporation, otherwise than that its inspector directed him what streets, or what portions of streets, to water. Such directions he was required to obey under the contract with Mrs. Dean for his employment. The carriage of the plaintiff was injured by the negligent driving of the cart, and in an action against the corporation for the injury he recovered a verdict, which was set aside, upon the ground that the driver was the servant of Mrs. Dean who had hired both him and the horse to the corporation.

In *N. Y. Lake Erie Western R. R.* v. *Steinbrenner*, 47 N. J., 161, the court approved the doctrine of *Quarman* v. *Burnett*, and it was held that the hiring of horses to be driven by a driver regularly in the employ of the person from whom the horses were hired, did not create the relation of master and servant between the hirer and the driver.

In *Little* v. *Hackett*, U. S. Sup. Ct., 116, 366, the court held that a person who hires a public hack and gives the driver directions as to the place to which he wishes to be conveyed, but exercises no other control over the conduct of the driver, is not responsible for his acts or negligence, nor prevented from recovering damages against the railroad for injuries suffered from a collision of its train with the hack, caused by the negligence of both the engineer of the train and the driver, and cites with approval *Quarman* v. *Burnett*, and *Jones* v. *Coropration of Liverpool*, supra.

In the case of *Huff* v. *Ford*, 126 Mass., 24, the defendant let to the City of Boston a horse, wagon, and driver by the day. At the time of the injury complained of, they were under the exclusive direction and control of the city as to where to go, where to unload, and what to do in the performance of the work. Suit was brought against the defendant, the owner of the team, for injuries sustained by the alleged negligence of the driver, and the court in its opinion said: "The driver, employed and paid by the defendant, who had

the entire management of the horses as to the manner of driving them, and whose duty it was to see that they were properly shod, was the servant of the defendant in so driving the horses and having them shod, and for the injuries to third persons by his negligence in these respects, the defendant was responsible."

The above cases, and cases cited in the opinions, show that the rule is well established that the person who hires his team, or teams, to another, which he manages and drives while engaged in doing the work for which the team is hired, is not a servant of the hirer, but a contractor, and if the driver of the team, not the plaintiff, is employed by the owner of the team, he is not the servant of the hirer, but of his employer, and the relation of master and servant does not exist between the hirer of the team and the driver. The facts in this case bring it within the doctrine of *Quarman* v. *Burnett,* and the court is of the opinion that the relation of master and servant did not exist between the plaintiffs and the defendants, and that the law applicable to master and servant does not apply in this case.

St. Croix Lake being a public highway, the plaintiffs had a right to travel upon it in any way they might choose, if they did not interfere with the rights of others to the use of the lake, in any manner recognized as lawful, and the defendants had no right to cut such a hole in the ice as the evidence shows they caused to be cut, without properly guarding it to protect travelers on the lake, as held by this court in *French* v. *Camp* et al., 18 Maine, 433. In that case the court instructed the jury, "that the citizens had a lawful right to travel on the river upon the ice, and that if they believed there had been a traveled path, as testified, and that if the defendants cut the ice so near as to render it dangerous to travel there, and that the plaintiff met with the loss of his horse in the manner stated in the testimony, and without any carelessness or fault on his part, but by reason of the cutting of the ice by the defendants, they would find for the plaintiff for the value of the horse so lost." The court held the instruction proper, and stated: "To cut a hole in the center of a road upon the ice, or so near it as to entrap a traveler, is a wanton and unnecessary disturbance of the rights of passage, . . . It is a violation of that great principle of social duty by which each one is required so to use his own rights, as not

to endanger the rights of others," and the verdict for the plaintiff was sustained.

The same doctrine was recognized in *Woodman* v. *Pitman,* 79 Maine, 456.

The cutting of the hole in the ice by the defendants, and leaving it unguarded, might well have been found by the jury to have been a wrongful act, and, under the facts of this case, to have been a nuisance, and that the damages sustained by the plaintiffs were caused by the wrongful act of the defendants in causing the hole to be cut and left unguarded, and that the defendants were liable therefor, if the plaintiff Luther, at the time of the accident, was in the exercise of due care and his own negligence did not contribute to the injury.

It is the opinion of a majority of the court that the question of the plaintiff's due care, and that of whether his negligence, if any, contributed to the injury, were questions of fact that should have been submitted to the jury.

The exclusion of the question asked the witness Sinclair was proper, as there was no evidence or offer to prove that the custom was of common prevalance and well known in the community, and that the defendants had knowledge of it.

*Dodge* v. *Favor* et al., 15 Gray, 82.

*Collins* v. *N. E. Iron Co.,* 115 Mass., 23.

*Bourbonnais* v. *West Boylston Mfg. Co.,* 184 Mass., 254.

*Exceptions sustained.*